FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

20 APR 28  PM 2: 47

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

HAGLER SYSTEMS, INC.; ROBERT    *
S. HAGLER, SR.; and DAVID R.    *
HAGLER, SR.,                     *
                                 *
        Plaintiffs,              *
                                 *
        v.                       *            CV 120-026
                                 *
HAGLER GROUP GLOBAL, LLC;        *
BENJAMIN L. HAGLER, SR.;         *
BENJAMIN L. HAGLER, JR.; and     *
LEE HENRY,                       *
                                 *
        Defendants.              *


## O R D E R

Before the Court is Plaintiffs' motion for a preliminary injunction. (Doc. 3.) In a telephonic hearing on March 17, 2020, the Court orally granted Plaintiffs' motion for a preliminary injunction and stated it would also enter a written order. (Minute Entry for Mar. 17, 2020 Telephonic Hr'g, Doc. 42; see also Tr. of Mar. 17, 2020 Hr'g, Doc. 51, at 6.) There are additional pending motions, but herein, the Court focuses only on the motion for a preliminary injunction.

## I. BACKGROUND

### A. Procedural History

On February 19, 2020, Plaintiffs filed the Verified Complaint for Temporary Restraining Order, Preliminary and Permanent

Injunction and Monetary Relief. (Compl., Doc. 1.) Contemporaneously, Plaintiffs filed the present Motion for Temporary Restraining Order and Preliminary Injunction with Incorporated Memorandum of Law. (Mot. for Injs., Doc. 3.) The Court held an *ex parte* hearing concerning the temporary restraining order ("TRO") and granted the TRO. (TRO, Doc. 7; Minute Entry for Feb. 19, 2020 *Ex Parte* Hr'g, Doc. 9.)

Plaintiffs also filed an Emergency Motion to Expedite Discovery and Emergency Motion for Hearing on an Expedited Basis (Mot. to Expedite Disc., Doc. 4), which the Court granted on February 25, 2020 (Order Granting Mot. to Expedite Disc., Doc. 15) after holding a telephonic hearing with all Parties on February 24, 2020 (Minute Entry for Feb. 24, 2020 Telephonic Hr'g, Doc. 13). Upon the Parties' agreement, the Court appointed United States Magistrate Judge Brian K. Epps as Special Master overseeing discovery disputes. (Order Granting Mot. to Expedite Disc., at 3-4.) The Court extended the TRO until it resolved Plaintiffs' motion for a preliminary injunction. (Order Extending TRO, Doc. 18; Tr. of Mar. 17, 2020 Hr'g, at 3-4.)

Plaintiffs moved for a preliminary injunction arguing Defendants violated the Defend Trade Secrets Act ("DTSA"), which includes a private right of action. (Mot. for Injs., at 17-22); see 18 U.S.C. § 1836(b). Defendants responded to Plaintiffs' motion for a preliminary injunction (Defs.' Resp. Opp'n Pls.' Mot.

for Injs., Doc. 19), and Plaintiffs replied (Pls.' Reply Supp. Mot. for Injs., Doc. 34).

Plaintiffs originally claimed the motion for a preliminary injunction was "only based on Plaintiffs' Claim 1 under the Federal [DTSA]." (Mot. for Injs., at 3 n.1.) Plaintiffs' primary argument, however, rested on Plaintiffs' belief that they validly rescinded the Separation Agreement and, therefore, were not suing under the Separation Agreement. (Compl., ¶ 109; see Mot. for Injs., at 19-20.) The Court recognized that to prove rescission, Plaintiffs also had to establish a valid fraud claim, which invoked Count III of Plaintiffs' Complaint. After hearing argument on March 13, 2020, from both sides concerning whether Defendants violated the DTSA, the Court requested that the Parties file supplemental briefs pertaining to Plaintiffs' fraud claim. (Minute Entry for Mar. 13, 2020 Hr'g, Doc. 41; see also Tr. of Mar. 17, 2020 Hr'g, at 2.) Plaintiffs submitted the supplemental brief on March 16, 2020 (Pls.' Suppl. Br. Supp. Mot for Injs., Doc. 37) and Defendants responded on March 17, 2020 (Defs.' Resp. Pls.' Suppl. Br. Supp. Mot. for Injs., Doc. 40). After receiving the briefs, the Court undertook the herein-contained analysis in granting Plaintiffs' motion for a preliminary injunction. (Tr. of Mar. 17, 2020 Telephonic Hr'g, at 6.)

**B. Underlying Facts**

1. The Parties

Plaintiff Robert ("Bob") Hagler, Sr., Plaintiff David R. Hagler, Sr., and Defendant Benjamin ("Ben") L. Hagler, Sr. are brothers who, until 2019, were directors of Plaintiff Hagler Systems, Inc. ("HSI") each owning one-third of HSI's shares. (Mot. for Injs., at 2; Bob Hagler Aff., Doc. 3-1, ¶ 3.) As discussed further below, in 2019, Ben Hagler, Sr. left HSI and created his own company, Hagler Group Global, LLC, which was to engage in similar business as HSI. (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 10.) Defendant Benjamin L. Hagler, Jr. is the son of Defendant Ben Hagler, Sr. Defendants Ben Hagler, Jr. and Lee Henry were employees of HSI who joined Hagler Group Global. (Id. at 2; see Sprouse Aff., Doc. 3-3, ¶¶ 5, 8.)

"HSI is an engineering, procurement, and construction company located in Augusta, Georgia[,] that develops engineering solutions for domestic and international clients in various industries including oil and gas, dredging, phosphate mining, sand, and gravel." (Bob Hagler Aff., ¶ 4.) According to Bob Hagler, HSI incurs high costs researching and developing solutions such that HSI realizes little, if any, profit on the initial production of a model of dredge or other machine. (Id. ¶ 10.) HSI makes its profits largely through service, maintenance, and subsequent productions of models. (Id. ¶¶ 10-11.) Because, according to

HSI, all of its information concerning the research and design of models it produces are trade secrets, no other company is able to service the models they build, and although companies could theoretically reverse engineer their machines and service them, the research and development costs to do so are extraordinary thereby preventing other companies from engaging in this behavior. (Id. ¶ 9; Mot. for Injs., at 18-19.)

### 2. HSI's Protection of its Alleged Trade Secrets

HSI's facilities may only be accessed by employees with RFID tags, and there are security cameras on the buildings. (Bob Hagler Aff., ¶ 25; Pls.' Reply Supp. Mot. for Injs., at 7.) HSI stores its allegedly trade secret information on its private database, Windchill, which the vendor, Datafrond, supplies. (Bob Hagler Dep., Doc. 46-2, at 141-42; Pls.' Suppl. Br. Supp. Mot. for Injs., at 3.) Windchill is only accessible by HSI employees with login credentials. (Bob Hagler Aff., ¶ 26.) HSI's engineering files are marked "PROPRIETARY AND CONFIDENTIAL." (Id. ¶ 29.) HSI's confidential information is only shared with customers after management approval and only to vendors pursuant to nondisclosure agreements. (Id. ¶ 30; Bob Hagler Dep., at 142.)

### 3. Ben Hagler, Sr. Separated from HSI

In 2019, a rift arose "between Bob and David [Hagler] on one side and Ben Hagler, Sr. on the other." (Mot. for Injs., at 2.) On June 14, 2019, Ben Hagler, Sr. "was terminated as an employee

by a resolution of the Board of Directors of HSI." But he "still remained a shareholder of HSI, and thus continued also as a member of the board of directors." (Pls.' Suppl. Br. Supp. Mot. for Injs., at 2; HSI Board of Directors Meeting Mins., Doc. 37-3.)

After June 14, 2019, Ben Hagler, Sr. never physically entered HSI property. (Ben Hagler, Sr. Decl., Doc. 20-1, ¶ 31.) Bob Hagler stated that in June 2019, Ben Hagler, Sr.'s "access to [HSI's document databases] and other company networks was . . . terminated." (Bob Hagler Aff., ¶ 34.) Ben Hagler, Sr. stated, HSI "allowed me to continue to access parts of its systems until August 2019 when my e-mail was discontinued." (Ben Hagler, Sr. Decl., ¶ 33.) After his employment termination, Bob Hagler and David Hagler "negotiated an agreement to buy out Ben Hagler Sr.'s interest in HSI." (Bob Hagler Aff., ¶ 35.) The Business Separation Agreement ("Separation Agreement") was "executed effective as of September 30, 2019," with a closing date of October 31, 2019. (Separation Agreement Sect. 1, Doc. 3-6, at 2.[1])

4. The Separation Agreement

Under the Separation Agreement, Ben Hagler, Sr. was to, until closing, "continue as an employee and shareholder of [HSI]." (Separation Agreement Sect. 3(a), at 3.) At closing, Ben Hagler, Sr.'s employment with HSI would be terminated. (Id.) To purchase

---

[1] The Court cites to the PDF page numbers supplied by CM/ECF.

Ben Hagler, Sr.'s interest in HSI and other HSI entities, HSI agreed to pay $2,488,000.00. (Separation Agreement Sect. 3(b), at 3.)   The Separation Agreement contains no restrictions on Ben Hagler, Sr.'s business activities as of its effective date. (Separation Agreement Sect. 3(e), at 4.)   Ben Hagler, Sr. would be able to compete unrestricted offering "the same products and services as . . . [HSI] has in the past."   (Id.)

The Parties agreed that "[HSI] and [Ben Hagler, Sr.] shall each be allowed to use any designs, plans, drawings, intellectual property, information and other work product in their possession in future business activities."   (Id.)   There was then a list of items Ben Hagler, Sr. was "allowed to receive and retain and use in [his] future business and professional activities," which included "[Ben Hagler, Sr.]'s Company computers, laptop, monitors, printers and accessories, which are already in his possession" and "a thumb drive or similar media of 3D models as requested by [Ben Hagler, Sr.] and approved by [HSI], which files are listed on attached Exhibit B."   (Separation Agreement Sects. 3(g)(iii),(v), at 4.)

The Separation Agreement included a merger clause: "This Agreement constitutes the entire agreement and understanding among the Parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings, written or

oral." (Separation Agreement Sect. 14, at 9.) Section 9 provided that HSI and its shareholders:

> [R]emise, release, acquit, and forever discharge, absolutely and unconditionally, [Ben Hagler, Sr.], and his heirs, successors and assigns, of and from any and all claims, damages, losses, causes of action, demands, debts, rights, obligations, or other liabilities of any nature whatsoever, known or unknown, actual or contingent, now existing or hereafter arising or accruing out of or related to any act, omission, event or circumstance related to [HSI and its shareholders'] connection to . . . [Ben Hagler, Sr.] which existed or occurred on or prior to Closing; provided, however, this release shall not apply to claims, obligations, or causes of action arising out of or pursuant to the terms of this Agreement or any document executed in connection herewith. The terms of this release are contractual and not a mere recital, and shall survive the execution of this Agreement and the Closing of the transactions contemplated herein.

(Separation Agreement Sect. 9, at 7.) The Separation Agreement also provided that "[n]o provision of this Agreement shall be interpreted against a Party because such Party or its legal representative drafted such provision." (Separation Agreement Sect. 14, at 9.)

5. Separation Agreement Negotiations and Contemporaneous Activity

From July to August, Ben Hagler, Sr. took steps toward creating his new company, Hagler Group Global. (See Docs. 37-9, 37-10.) On July 22, 2019, Ben Hagler, Sr. asked for technical help from a technical consulting company, iRangers, and conveyed to them that he would "be requesting to have a copy of all data files" and was working "with Datafrond today to discuss what would

be required for [him] to get an entire copy of Windchill running on [his] computers in [his] home." (E-mail Chain Between Ben Hagler, Sr. & iRangers, Doc. 37-11, at 6-7.) That same day, Ben Hagler, Sr. reached out to Hemant Jatla, an employee at Datafrond. (July 22, 2019 E-mail from Ben Hagler, Sr. to Hemant Jatla, Doc. 37-5, at 2.) Ben Hagler, Sr. told Mr. Jatla that he was "setting up a new company and do[ing] consulting" and asked Mr. Jatla what it would take "to get a copy of Windchill" because he did "not want to start [his] company and not have access to everything from [his] past." (Id.)

On July 29, 2019, Denis Mejnov of iRangers informed Ben Hagler, Sr. that "before we proceed with the data migration, we have to receive approval from Hagler Systems for data extraction." (E-mail Chain Between Ben Hagler, Sr. & iRangers, at 4.) Ben Hagler, Sr. told Mr. Mejnov, on August 9, 2019, "I am in process of negotiation… and not final. It is not certain that I will even leave. It is possible that another brother will retire…." (Id. at 2 (ellipses in original).) Ben Hagler, Sr. then stated, "I have provided a link to a Dropbox and at this time … would like to have a copy of the Windchill VM's if possible. If this is not possible … I understand… I am just impatient." (Id. at 3 (ellipses in original).)

On August 12, 2019, Mr. Mejnov responded, "Our company has a firm policy regarding a client's info and privacy. I tried to

find a way to help you.  Unfortunately, I cannot do much without execution content." (Id. at 2.)  Ben Hagler, Sr. responded, "Great!  That is best I agree." (Id.)

At some point while negotiating the Separation Agreement, it became clear HSI would not agree to give Ben Hagler, Sr. all of the Windchill files.  (See Sept. 10, 2019 E-mail with Revised Separation Agreement from Wayne Peters, Doc. 37-12, at 2, 5.)  On September 10, 2019, Ben Hagler, Sr.'s attorney, Wayne Peters, submitted a revised version of the Separation Agreement to Ray Massey, HSI's attorney, wherein Mr. Peters stated:

> We proposed a purchase price reduction of $150,000 based on the assumption that Ben would receive a copy of the Windchill system and software.  You have told me that Bob and David are unwilling to transfer a copy of the Windchill system and software to Ben.  To try to resolve this matter, we have revised the agreement to eliminate the requirement of providing the Windchill system and software to Ben.  While it is not nearly as beneficial to Ben, he is willing to accept having 3D drawings and project files extracted from Windchill, without having the benefit of the Windchill system and software.

(Id. at 2.)

Under the prior version to the September 10, 2019 revision, Ben Hagler, Sr. was to receive and retain "a current usable digital image or copy of all H:Drive, Windchill Applications and Windchill Database, Dynamics 365 Virtual Machines" and "an image or copy of Windchill System and software and setups and all 3-D model designs, drawings, calculations, documents, metadata, and related information." (Id. at 5.)  Mr. Peters's suggested revisal still

allowed Ben Hagler, Sr. "a current usable digital image or copy of all H:Drive files, Dynamics 365 Virtual Machine, Office 365 Group Files, all associated CAD[2] files, 3D Models and metadata exported from Windchill by Datafrond, to be uploaded to Seller's Cloud Storage and copied to a NAS Device." (Id.)

On September 12, 2019, Mr. Massey responded with another revised version that removed the above quoted language and replaced it with "3D models and project files as requested by [Ben Hagler, Sr.] and approved by [HSI and its shareholders], which is attached hereto as Exhibit A." (Sept. 12, 2019 E-mail with Revised Separation Agreement from Ray Massey, Doc. 37-13, at 6.) Thus, by September 12, 2019, it seems Ben Hagler, Sr. knew he would not be granted a copy of Windchill or extracted project files under the Separation Agreement except as listed in the attached exhibit.

On September 15, 2019, Ben Hagler, Sr. told Mr. Jatla that he believed he had a way to "get all our CAD documents easily." (Sept. 15, 2019 E-mail from Ben Hagler, Sr. to Hemant Jatla, Doc. 37-14, at 2.) Two days later, Ben Hagler, Sr. told Mr. Jatla, "We are slowly getting all files" and asked for "a table of all CAD files that includes as many file attributes as you can easily add." (Sept. 17, 2019 E-mail from Ben Hagler, Sr. to Hemant Jatla, Doc.

---

[2] CAD files are computer-aided design files.  (Compl., ¶ 27.)

37-15, at 2.)   It appears Ben Hagler, Sr. received all extracted

Windchill files through an HSI employee, Chase Sprouse.

     Mr. Sprouse affied:

> At some point in late August or early September, Ben
> Hagler, Sr. told me that his Separation Agreement with
> HSI would allow him to keep any files he had in his
> possession by the end of September.   He asked me to
> assist him with obtaining all of HSI's confidential and
> proprietary information from Windchill, HSI's internal
> data management system.   Ben Hagler, Sr. convinced me
> that, as a one[-]third owner of HSI, he had equal rights
> to all of this confidential and proprietary information.
>
> Additionally, Ben Hagler, Sr. paid me $2,000[.00] in
> cash, made in two $1,000.00 payments, to assist me with
> this theft of information.   The first payment of
> $1,000.00 he gave to me on or about November 5, 2019[,]
> at his house . . . .   The second payment of $1,000.00 he
> gave to me on or about December 16, 2019, also at his
> house.
>
> In all, between September 12, 2019[,] and September 27,
> 2019, I assisted Hagler Group and Ben Hagler, Sr. in
> stealing over 58,430 confidential and proprietary
> product plans, designs, drawings, specifications,
> manufacturing instructions, calculations, and CAD files
> from HSI and provided them to Ben Hagler, Sr. for the
> use in his new company Hagler Group Global, LLC . . . .

(Sprouse Aff., ¶¶ 13-15.)   According to Mr. Sprouse, he:

> [W]ould download files from Windchill to [his] desktop
> computer at HSI and then transfer them to a . . . [two]
> Terabyte hard drive that Ben Hagler, Sr. provided to
> [him].   Once this hard drive was full, [he] would meet
> Ben Hagler, Sr. and Benjamin Hagler, Jr. at Ben Hagler,
> Sr.'s house and exchange the hard drive for an empty
> hard drive.

(Id. ¶ 16.)   In his deposition, Mr. Sprouse was less clear on the

purpose of the payments, providing: "When [Ben Hagler, Sr.] handed

me the cash, he said . . . this is for whatever you've done up to

this point, . . . which was setting up the ERP system, working on the website, and . . . it was very open ended to what the payment was for and there was no promise of a payment to get the download specifically." (Sprouse Dep., Doc. 45-5, at 75:3-15.)  Mr. Sprouse would "[s]ometimes . . . download the files during the workday; however, more often [he] would log into [his] work desktop computer over a [r]emote [d]esktop connection and download files" outside normal working hours.  (Sprouse Aff., ¶¶ 19-37.)

Ben Hagler, Sr. stated that these actions were to "organize" the files he mostly already had because he "would regularly download company information to his laptop, desktop, or other external hard drives."  (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 7-8.)  Thus, according to Ben Hagler, Sr., he "already possessed many of these files in some format."  (Id. at 7.)

6. Post-Separation Agreement Activity

In early December 2019 — after the effective date and closing date of the Separation Agreement — Ben Hagler, Sr. contacted Mr. Sprouse "about obtaining drawings for the Gland Water Station, a new project that HSI [was] [then] bidding on with its client Suncor." (Sprouse Aff., ¶ 39.)  Mr. Sprouse "downloaded the [four] Gland Water Station drawings" and "gave them to Ben Hagler, Sr. on a flash drive."  (Id. ¶ 41.)  Hagler Group Global submitted a competing bid to Suncor for the Gland Water Station Pump.  (Bob Hagler Aff., ¶ 60.)  Lee Henry also told Suncor that Hagler Group

Global "owns full rights to any assets, designs, and [intellectual property] of [HSI]" and "would like to continue working with Suncor by providing support for the equipment that we have supplied over the years." (Dec. 3, 2019 E-mail from Lee Henry to Suncor, Doc. 3-8, at 14-15.)

7. Defendants' Actions Discovered, Alleged Acts of Rescission, and Complaint Filed

In January 2020, Plaintiffs became aware of the actions taken by Ben Hagler, Sr., Lee Henry, and Hagler Group Global towards Suncor. (Mot. for Injs., at 12-13.) Thereafter, Plaintiffs discovered the bulk downloads of HSI trade secrets perpetrated by Mr. Sprouse, and by February 17, 2020, Mr. "Sprouse finished explaining the extent of his theft." (Id. at 14.) At 1:10 p.m. on February 19, 2020, Plaintiffs' Attorney Robert Caison e-mailed Wayne Peters and Ben Hagler, Sr., among others, attaching a letter from Attorney Robert Hagler stating:

> We have irrefutable evidence that Ben Hagler committed actionable fraud in the inducement of the Separation Agreement in that prior to the closing he stole *all* of . . . [HSI]'s confidential and proprietary product plans, designs, drawings, specifications, manufacturing instructions, calculations, and CAD files, virtually all of . . . [HSI]'s trade secrets. This included 58,000 computer files that he illegally and wrongfully downloaded from . . . [HSI]'s Windchill storage data system in concert with others.

(Feb. 19, 2020 E-mail & Letter, Doc. 37-17, at 3 (emphasis in original).) Based on the above alleged fraud, Attorney Robert Hagler informed Mr. Peters that they were "rescinding the

14

Separation Agreement," "demanding that Ben Hagler immediately return all consideration," and "unable at this time to make a tender of the consideration they received in the sale ([Ben Hagler, Sr.]'s interest in the stock of [HSI]) in that it would be unreasonable to do so until damages are determined" given that the damage to HSI "will likely exceed several million dollars." (Id. at 3-4.) At 2:20 p.m. that same day, Plaintiffs initiated the present action. (Notice of E-Filing, Doc. 37-18.) The Complaint raised three counts: Count I: Violation of the DTSA; Count II: Conspiracy to violate the DTSA; and Count III: Fraud. (Compl., ¶¶ 114-146.)

## II. LEGAL STANDARD

A district court has discretion over whether to grant or deny a preliminary injunction, but the discretion is not unbridled and must be exercised in light of the four prerequisites for granting the "extraordinary relief." Canal Auth. of the State of Fla. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974). A district court may grant a preliminary injunction only when a movant shows four prerequisites:

> (1)  [I]t has a substantial likelihood of success on the merits;
> (2)  [T]he movant will suffer irreparable injury unless the injunction is issued;
> (3)  [T]he threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party;[3] and

---

[3] Prerequisite three is often referred to as the "balance of the harms."

15

(4)  [I]f  issued,  the  injunction  would  not
disserve the public interest.

CBS Broad., Inc. v. EchoStar Commc'ns Corp., 265 F.3d 1193, 1200

(11th Cir. 2001).  A preliminary injunction may not be granted

"'unless the movant clearly establishe[s] the "burden of

persuasion"' as to each of the four prerequisites." Siegel v.

LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting McDonald's

Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).

## III. DISCUSSION

### A. The Substantial Likelihood of Success on the Merits

Plaintiffs argued they rescinded the Separation Agreement,

and thus, the Separation Agreement does not impact whether Ben

Hagler, Sr. misappropriated HSI trade secrets.  (Pls.' Reply Supp.

Mot. for Injs., at 14-15.)  As such, the Court analyzes, first,

whether Plaintiffs rescinded the Separation Agreement, and second,

whether Ben Hagler, Sr. misappropriated HSI's trade secrets.

### 1. Separation Agreement Rescinded

Validly rescinding an agreement for fraud requires (a) taking

certain procedural measures and (b) proving the underlying fraud

resulting in the sought rescission.  See O.C.G.A. § 13-4-60.  At

this stage, Plaintiffs must show a substantial likelihood that

both requirements are met.

Before analyzing Plaintiffs' rescission claim, the Court

notes that the merger clause within the Separation Agreement does

16

not prevent Plaintiffs' fraud claim.  Defendants argued that the

Separation Agreement gave Ben Hagler, Sr. the right to anything in

his possession (Separation Agreement Sect. 3(e), at 4), and "[t]he

merger clause bars [HSI] from rescinding the Separation Agreement

based on its extra-contractual 'understanding' that Ben Hagler,

Sr. . . . only retained a 'small amount of information.'"  (Defs.'

Resp. Opp'n Pls. Mot. for Injs., at 13.)  Defendants cite Reininger

v. O'Neill, where the court found any allegedly fraudulent

statements concerning the state of the property made prior to the

contract were not the "type of fraud that allows a party to cancel

or rescind a contract" when any alleged misrepresentation from the

property seller about the basement water leakage prior to the

contract would directly contradict the contract provision

providing "that the 'Property is being sold in its present

condition, without warranties or guarantees of any kind.'"  729

S.E.2d 587, 592 (Ga. Ct. App. 2012) (quoting Novare Grp., Inc. v.

Sarif, 718 S.E.2d 304, 308 (Ga. 2011)); (Defs.' Resp. Opp'n Pls.'

Mot. for Injs., at 13, 13 n.12.)  Here, however, Plaintiffs fraud

assertion is different from that in Reininger.  Plaintiffs are not

asserting reliance on precontractual representations contradicting

the terms of the agreement.  Rather, Plaintiffs allege that Ben

Hagler, Sr. engaged in secretive behaviors contrary to the

provisions in the Separation Agreement specifying what documents

he could receive and retain by using a third party to take tens of

thousands of HSI documents after Plaintiffs denied his request for those documents during the negotiations. Thus, the merger clause does not prevent Plaintiffs from rescinding the contract.

a. *Procedural*

O.C.G.A. § 13-4-60 states: "A contract may be rescinded at the instance of the party defrauded; but, in order to rescind, the defrauded party must promptly, upon discovery of the fraud, restore or offer to restore to the other party whatever he has received by virtue of the contract if it is of any value." This provision has two condition precedents to effective rescission: prompt notice of rescission and a tender of consideration. Payne v. DOCO Fed. Credit Union, No. 1:15-CV-152 (LJA), 2016 WL 9753973, at *6 (M.D. Ga. July 1, 2016). The Parties adamantly dispute whether both requirements are met.

"When the fraud is discovered[,] the party defrauded is put to his election to disaffirm the contract. He should not delay without cause." Newton v. Burks, 229 S.E.2d 94, 95 (Ga. Ct. App. 1976). Defendants did not argue that Plaintiffs failed to act promptly measured by the time between Plaintiffs' discovery of the underlying alleged misappropriation and the letter of rescission. Instead, Defendants argued the notice was not prompt because it was provided the same day as the Complaint.

Case law shows that rescission is insufficiently prompt if notice is provided after a lawsuit has been filed. Novare Grp.,

18

718 S.E.2d at 308 (finding rescission was not prompt when, although "Purchasers sent a certified letter to Developers' counsel purporting to rescind their agreements on the same day they filed their lawsuit[,] . . . the letter clearly states that the lawsuit had already been filed"). There is also case law showing notice of rescission provided contemporaneously with the filing of a lawsuit, i.e., in the complaint itself, fails the promptness requirement. Am. Family Life Assurance Co. of Columbus v. Intervoice, Inc., 659 F. Supp. 2d 1271, 1281 (M.D. Ga. 2009); see also Wender & Roberts, Inc. v. Wender, 518 S.E.2d 154, 160 (Ga. Ct. App. 1999) ("[I]t is too late to claim rescission by asserting it for the first time in the pleadings.").

Here, Plaintiffs e-mailed Defendants and Ben Hagler, Sr.'s attorney their decision to rescind and sue an hour before filing the lawsuit. Defendants allege this is "contemporaneous" notice. Contemporaneous as used by the cases cited refers to notices of rescission embedded within the pleadings. Defendants cite no case covering the situation here where Plaintiffs stated their intent to rescind before filing the lawsuit but within the same day. Given that the rescission rule requires "prompt" notice, which under established law means not within the complaint or after the complaint is filed, and there are no direct arguments showing the notice of rescission was not prompt, the Court finds, at this stage

19

in the litigation, Plaintiffs show a substantial likelihood that they provided prompt notice of rescission.

The question remains whether Plaintiffs meet the requirement of tendering consideration.

> Under Georgia law, a party seeking to rescind must either make a tender *or* show a sufficient reason for not doing so; he need not tender back what he is entitled to keep, and need not offer to restore where the defrauding party has made restoration impossible, or when to do so would be unreasonable.

Stafford v. Gareleck, 769 S.E.2d 169, 172 (Ga. Ct. App. 2015) (emphasis in original) (citation and internal quotation marks omitted). Georgia courts do "not require the useless procedure of returning a part which should be included in the larger sum which it seeks to recover." Ga. R.R. Bank & Tr. Co. v. Liberty Nat'l Bank & Tr. Co., 177 S.E. 803, 813 (1934). Notwithstanding, the rescinding party must derive no unconscionable benefit from rescinding. Meadow River Lumber Co. v. Univ. of Ga. Research Found. Inc., 503 S.E.2d 655, 661 (1998).

Plaintiffs argued that tendering the consideration under the Separation Agreement would be unreasonable because the consideration retained by Ben Hagler, Sr. were his one-third shares in HSI, which if returned, would automatically restore him as a director of HSI. (Pls.' Suppl. Br. Supp. Mot. for Injs., at 8.) Given Ben Hagler, Sr.'s alleged misappropriation of HSI's trade

20

secrets and current competitive behavior, Plaintiffs argued it is unreasonable to return to Ben Hagler, Sr. his shares in HSI.   (Id.)

Defendants responded citing Wender.   (Defs.' Resp. Pls.' Suppl. Br. Supp. Mot. for Injs., at 2.)   In Wender, two brothers were majority shareholders of a company when the brother who was the company president discovered that his brother was embezzling company money.   518 S.E.2d at 156.   The brothers and company entered into an agreement whereby the embezzling brother resigned, agreed to "sell his stock to the company for significantly less than its market value" to be paid "in 120 monthly installments of $1,000 each," and would provide the company consulting services for a yearly salary.   Id.   Three years into the agreement, the company stopped making payments and the embezzling brother sued. Id.   The company and president brother counterclaimed and, in the counterclaim pleading, alleged rescission but made no attempt at tendering consideration.   Id. at 157, 160.   The court of appeals stated that "in order to rescind the contract they were required to make some offer regarding the stock that [the embezzling brother] sold to them at a significantly reduced price, such as returning it to him for the money already paid or offering to pay him the full value of the stock."   Id. at 160.

Both options are inapplicable here.   First, becoming a director of HSI comes as a result of share ownership, therefore, returning Ben Hagler, Sr.'s shares automatically reinstates him as

21

a director.  Second, it does not appear Plaintiffs paid Ben Hagler, Sr. a significantly reduced price for the stock.  As such, Wender does not compel the Court to find Plaintiffs failed to rescind by asserting that tendering consideration would be unreasonable. Consequently, the Court finds Plaintiffs showed a substantial likelihood that they procedurally rescinded the Separation Agreement.  The question remains whether Ben Hagler, Sr. engaged in fraud in the inducement supporting the rescission.

> b. *Fraud in the Inducement*

There are five elements of fraud: "(1) a false representation or omission of material fact; (2) scienter; (3) an intent to induce the party alleging fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." Paul v. Destito, 550 S.E.2d 739, 744 (Ga. Ct. App. 2001).  Defendants did not dispute that elements two, three, and five are met.  (See Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 21-24; Defs.' Resp. Pls.' Suppl. Br. Supp. Mot. for Injs., at 8-13.)  Thus, the Court focuses on elements one and four.

> i. False Representation or Omission of Material Fact

"[A]s a general rule, one who is contracting with another is under no obligation to make disclosure of his own affairs to any third party." Reeves v. B.T. Williams & Co., 127 S.E. 293, 295 (Ga. 1925).  Under O.C.G.A § 23-2-53, however, "[s]uppression of

22

a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." A duty arises from particular circumstances when a defendant intentionally concealed a fact to obtain an advantage or a benefit. Ga. Real Estate Comm'n v. Brown, 262 S.E.2d 596, 597 (Ga. Ct. App. 1979). As explained by Defendants, Plaintiffs must show that Ben Hagler, Sr. knew the Plaintiffs harbored a different interpretation of the contractual terms and remained silent. (Defs.' Resp. Pls.' Suppl. Br. Supp. Mot. for Injs., at 9-10.)

The Court has no trouble finding a substantial likelihood that Ben Hagler, Sr. had a duty to disclose his acquisition of tens of thousands of HSI documents from the Windchill database. The duty to disclose arises from the fact that the Parties specifically negotiated whether to allow Ben Hagler, Sr. copies of the Windchill database documents. Around the time it became clear Plaintiffs would not agree to this — instead, only allowing Ben Hagler, Sr. to receive and retain a limited number of pre-approved documents and what was in Ben Hagler, Sr.'s possession on his computer — Ben Hagler, Sr. requested an HSI employee with Windchill access to download the documents and paid him after the deliveries. As a result, Ben Hagler, Sr. acquired over 58,000 Windchill database documents after Plaintiffs denied his request

to obtain those documents through the Separation Agreement.
Defendants' argument that "there is no evidence that Ben Hagler,
Sr. was aware of [HSI's] 'understanding' that he retained only the
intellectual property on his laptop" is insufficient to defeat
Plaintiffs' substantial likelihood of success showing.   (Defs.'
Resp. Pls.' Suppl. Br. Supp. Mot. for Injs., at 10.)

Having recently denied Ben Hagler, Sr.'s request for the
Windchill database documents, Plaintiffs' likely lacked awareness
he had copies of those documents.   It is further unlikely
Plaintiffs would have executed the Separation Agreement had they
known of Ben Hagler, Sr.'s acquisition, again, because they
recently denied his request for those documents.   Thus, Ben Hagler,
Sr. could only realize and retain the benefit of the Windchill
database documents if Plaintiffs remained unaware of his
acquisition.   The facts show Ben Hagler, Sr.'s awareness that
Plaintiffs harbored a different understanding and chose to remain
silent about his concealed actions.   As such, the Court finds
Plaintiffs showed a substantial likelihood that Ben Hagler, Sr.
had a duty to disclose he actively acquired more than 58,000
Windchill database documents after Plaintiffs denied his request
to receive those documents under the Separation Agreement.

ii.   Justifiable Reliance

Justifiable reliance requires Plaintiffs to show they could
not have discovered the fraud through the exercise of due

24

diligence.  Groce v. M24, LLC, 816 S.E.2d 703, 705 (Ga. Ct. App. 2018).  There is no justifiable reliance if Plaintiffs, "by the exercise of the slightest degree of diligence, could have prevented the . . . [alleged] fraud."  Charles v. Simmons, 113 S.E.2d 604, 606 (Ga. 1960); see Harish v. Raj, 474 S.E.2d 624, 626 (Ga. Ct. App. 1996) (finding the "plaintiffs failed to exercise ordinary diligence by independently verifying the value of their stock before selling it").

Defendants argued Plaintiffs "could have easily discovered Ben Hagler, Sr.'s alleged 'fraud' with only minimal effort." (Defs.' Resp. Pls.' Suppl. Br. Supp. Mot. for Injs., at 12.) Defendants supported their position with Wender, discussed above. In Wender, despite knowledge concerning his brother's embezzlement, the president brother did not verify the amount embezzled by failing to request "the location of the missing financial records" or "any written estimate of the total amount of money he had embezzled."  518 S.E.2d at 158-59.  Three years after executing the contract wherein the embezzling brother resigned, the president brother attempted to rescind the contract for fraud because he discovered that his brother embezzled more money than he previously thought.  Id. at 159.  The court found an absence of due diligence when the president brother never verified the amount embezzled.  Id.

The Court finds Plaintiffs likely justifiably relied on the fact that if Ben Hagler Sr. requested a copy of the Windchill database documents, he did not possess those documents. And when Ben Hagler, Sr. requested the documents, he lacked Windchill access removing his ability to acquire those documents on his own after Plaintiffs denied his request. Even if Plaintiffs had searched for what documents Ben Hagler, Sr. had in his possession when he had Windchill access, it would not have revealed the more than 58,000 documents Ben Hagler, Sr. later acquired. Plaintiffs could only have discovered Ben Hagler, Sr.'s document acquisition if they searched his computers in mid- to late-September 2019. Although it would have been shrewd for Plaintiffs to determine what was in Ben Hagler, Sr.'s possession upon terminating his Windchill access, they would not have discovered the documents at issue here.

Lastly, Defendants asserted Ben Hagler, Sr. possessed many documents before using Mr. Sprouse; however, that did not give him the right to acquire tens of thousands more documents or updated copies of what he allegedly had. (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 7.) For the foregoing reasons, the Court finds Plaintiffs demonstrated a substantial likelihood that Ben Hagler, Sr. engaged in fraud supporting rescission of the Separation Agreement.

2. <u>Trade Secret Misappropriation Under the DTSA</u>

The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. In relevant part, 18 U.S.C. § 1832(a) provides:

> Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly —
>
> > (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
> >
> > (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information; [and]
> >
> > (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization . . . .

The Court discusses whether (a) the allegedly stolen documents were HSI's trade secrets, and if so, (b) Ben Hagler, Sr. misappropriated those trade secrets.

c. *Trade Secrets*

The DTSA defines trade secret as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations,

program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if —

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

There is no dispute that the information taken from HSI contained products used and intended for use in interstate commerce given that the information was related to products built and serviced in different states, including "Florida, Wisconsin, Arkansas, Texas, and Mississippi." (Bob Hagler Aff., ¶ 66.) The information was acquired for Ben Hagler, Sr. and Hagler Group Global's economic benefit because the information allowed Hagler Group Global to operate as a competing business as shown by Hagler Group Global using acquired documents to submit a competing bid to HSI's client, Suncor, and to offer support to Suncor for the systems HSI built.

It is also undisputed that the information acquired is the type of information that qualifies as a trade secret if reasonably maintained. A trade secret under the DTSA is defined broadly and

covers the numerous "patterns, plans, . . . designs, prototypes, methods, techniques, processes, [and] procedures" at issue in this case. Plaintiffs showed that the information derives value from not generally being known because competitors possessing project information could compete with lower bids on new projects given that competitors would not have the extensive research costs. (Mot. for Injs., at 18-19.) Competitors could also then service projects HSI built, which is a major part of how HSI realizes profits. (Id.)

The only plausible argument Defendants raised opposing the trade secret requirement is that Plaintiffs did not take reasonable measures to keep the information secret. (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 19-21.) The argument is insufficient to defeat the injunction. HSI's protection is distinguishable from Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, a case offered by Defendants, where the Eleventh Circuit determined the employer failed to take reasonable measures to protect the information. 898 F.3d 1279, 1300 (11th Cir. 2018); (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 19.) In so deciding, the Eleventh Circuit found persuasive that the employee refused to sign a confidentiality agreement, the employer "compromised the efficacy of [any protective] measures by encouraging [the employee] to keep the [c]ustomer [i]nformation on his cellphone and personal laptop," the employer did not "mark[] the [c]ustomer [i]nformation as

29

confidential," the employer failed to instruct the employee "to secure the information on his personal devices," and the employer declined to "request [that the employee] return or delete any of the information."  898 F.3d at 1300.

First, the Court reiterates that when Ben Hagler, Sr. acquired the document copies discussed herein, the documents were protected on Windchill such that he had no access; he had to recruit a third party with access.  Mr. Sprouse himself also downloaded most of the information outside working hours presumably to avoid suspicion potentially raised by such large downloads.  Ben Hagler, Sr. additionally sought information in December 2019, well after the separation was finalized.  Second, although it seems Plaintiffs were aware of the possibility that Ben Hagler, Sr. downloaded some information for use outside of Windchill before his June termination, Ben Hagler, Sr. does not claim he had all of the later-acquired information nor that Plaintiffs encouraged him to systematically download copies of more than 58,000 documents. There is also no claim that Ben Hagler, Sr.'s laptop, which was the company laptop he was allowed to retain after separation, was unsecured.  Third, many of the documents were clearly marked as confidential and proprietary.  Fourth, at the time he acquired these documents, Ben Hagler, Sr. was a shareholder and director of HSI.  Fifth, there was physical security on the property, electronic security tracking Windchill activity, and remote access

to Windchill was only available through HSI's virtual private network, which required additional credentials.

The situation presented here is more akin to Convergent Nonprofit Sols., LLC v. Wick, where the district court found the company "took reasonable measures to keep the information secret, including requiring [the employee] to sign a [confidentiality agreement], requiring her to log onto the system with a username and password, and contracting with a third party to monitor and audit access to the information." No. 6:19-cv-1157-Orl-40DCI, 2019 WL 7423549, at *6 (M.D. Fla. Sept. 5, 2019). The Court finds Plaintiffs meet their burden at this stage to show HSI used reasonable measures to keep the acquired information secret. Consequently, the information Ben Hagler, Sr. acquired qualifies as trade secrets under the DTSA. The question remains whether Plaintiffs have shown a substantial likelihood that Ben Hagler, Sr. misappropriated those trade secrets.

d. *Misappropriation*

The DTSA defines misappropriation as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who —

    (i) used improper means to acquire knowledge of the trade secret;

31

(ii) at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was —

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . .

18 U.S.C. § 1839(5).   Improper means "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Id. § 1839(6)(A).

Because the Court found above there is a substantial likelihood that Plaintiffs rescinded the Separation Agreement, Defendants' argument that Plaintiffs consented to the acquisition through the Separation Agreement (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 17-18) is irrelevant.  Addressing the remaining arguments, the Court notes Plaintiffs' motion for a preliminary injunction satisfies Federal Rule of Civil Procedure 65(d)'s reasonable particularity requirement by describing the stolen trade secrets as "over 58,430 confidential and proprietary product plans, designs, drawings, specifications, manufacturing instructions, calculations, and CAD files from HSI" and explaining

32

the dates the information was taken from HSI by Chase Sprouse. (Mot. for Injs., at 1-3.)  The categories and other descriptors put Defendants "on notice of the nature of . . . [Plaintiffs'] claims" and allowed Defendants to "discern the relevancy of any requested discovery on the trade secrets at issue." Amendia, Inc. v. Omni Surgical, LLC, No. 1:12-CV-1168-CC, 2012 WL 13014585, at *3 (N.D. Ga. June 8, 2012) (quoting DeRubeis v. Witten Techs., Inc., 244 F.R.D. 676, 681 (N.D. Ga. 2007); (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 18-19.)

After Ben Hagler, Sr. argued Plaintiffs failed to identify the documents with reasonable particularity preventing him from identifying the documents, he asserted he held the rights to those documents because he developed them.  (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 21; Ben Hagler, Sr. Decl., ¶ 11 ("I either developed or assisted in developing all of the . . . files described in paragraph [twenty-seven] of the Verified Complaint.") (internal quotation marks omitted).)  It is implausible that Ben Hagler, Sr. developed each one of the more than 58,000 documents. Even if feasible, it is likely incorrect that Ben Hagler, Sr. held the rights to those documents.  Regardless, Ben Hagler, Sr. failed to offer any evidence supporting the contention that he developed each document apart from general statements that he "developed or assisted in developing" the files or "developed or led the team that developed all of the 'Most Valuable Projects.'"  (Ben Hagler,

Sr. Decl., ¶¶ 11-12.)  With such limited evidence, the Court cannot find Ben Hagler, Sr. developed each document acquired through Mr. Sprouse.   For the foregoing reasons, Plaintiffs have shown a substantial likelihood of success that Ben Hagler, Sr. misappropriated HSI's trade secrets.

## B. Whether the Movant Will Suffer an Irreparable Injury Unless the Injunction is Issued

An irreparable injury is one that "cannot be undone through monetary remedies."  United States v. Jenkins, 714 F. Supp. 2d 1213, 1221 (S.D. Ga. 2008) (quoting Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981)).  Plaintiffs must show irreparable injury is likely, not just possible.  See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (stating the "possibility" of harm "standard is too lenient"). "[I]njuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory . . . relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974).  In addition, the harm "must be likely to occur after the plaintiff[s'] request for an injunction and before resolution of the case on the merits — i.e., it must constitute future harm."  Jenkins, 714 F. Supp. 2d at 1221.

"Irreparable harm is presumed when . . . solicitation of customers occurs." <u>Convergent Nonprofit Sols.</u>, 2019 WL 7423549, at *7 (citation omitted). In <u>Specialty Chems. & Servs., Inc. v. Chandler</u>, cited by Plaintiffs, the court found:

> In light of evidence showing that defendants possess a number of [the plaintiff's] trade secrets, the threat of disclosure or use is significant. Furthermore, the [c]ourt has previously found that "[the defendants] used a number of proprietary chemical formulas belonging to [the plaintiff] to make their products." . . . Prior use of misappropriated trade secrets is sufficient evidence of likely irreparable harm to support injunctive relief.

No. 1:87CV-2338MHS, 1988 WL 618583, at *5 (N.D. Ga. Sept. 29, 1988); (Mot. for Injs., at 23.)

Here, not only is the threat of use and disclosure significant given that Ben Hagler, Sr. created a business directly competing with HSI and maintains copies of an extensive amount of HSI's trade secrets, but Ben Hagler, Sr. and Hagler Group Global already used some of the misappropriated trade secrets to offer a bid to and otherwise solicit Suncor. Thus, there is no doubt HSI will suffer irreparable harm if the injunction is not issued.

**C. The Balance of the Harms**

Defendants argued there is no trade secret; therefore, no harm to Plaintiffs. (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 25.) At this point, however, the Court has already determined Plaintiffs showed a substantial likelihood that Ben Hagler, Sr. misappropriated HSI's trade secrets and has used — and will likely

continue to use — those trade secrets to compete against HSI and solicit its customers.   The Court has also found Plaintiffs identified the trade secrets with reasonable particularity.   (See id.)

Defendants lastly contended the "requested injunctive relief threatens [Hagler Group Global's] very viability." (Id.)  A party, however, "cannot suffer compensable harm when enjoined from an unlawful activity."  Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc., 793 F. Supp. 2d 1302, 1314 (N.D. Ga. 2011); see also Convergent Nonprofit Sols., 2019 WL 7423549, at *7 ("To permit the [d]efendant to misappropriate proprietary information acquired over many years by [the plaintiff's] founders and to then profit from such conduct by competing with her former employer would be unjust.").  The balance of the harms weighs in favor of granting the injunction.

## D. If Issued, the Injunction Would Not Disserve the Public Interest

Defendants claimed the public interest served here is in enforcing a valid contract.  (Defs.' Resp. Opp'n Pls.' Mot. for Injs., at 25.)  The law offers a way to rescind otherwise valid contracts, and at least at this stage in the proceeding, the Court finds Plaintiffs offer enough evidence to show a substantial likelihood that they met the legal requirements for rescission.

On the other hand, "[t]here is a strong public interest in protecting confidential information . . . , thereby promoting

legitimate business interests." <u>Convergent Nonprofit Sols.</u>, 2019
WL 7423549, at *7.    Further, "[t]he public's interest in
safeguarding trade secrets and enforcing contractual obligations
is satisfied by the issuance of an injunction." <u>Id.</u> As such, the
Court finds the public interest is served by granting this
injunction.

### IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a
preliminary injunction (Doc. 3) is **GRANTED**.    The preliminary
injunction terms are the same as the temporary restraining order
previously issued.    (Doc. 7.)   Plaintiffs' already supplied
$25,000.00 cash bond for the temporary restraining order (<u>id.</u> at
2) is sufficient for the preliminary injunction.   No additional
bond is required.

**ORDER ENTERED** at Augusta, Georgia, this 28th day of April,
2020

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA